THE STATE EX REL. J. N. ROBERTS v. FRANCIS H. TRIMBLE ET AL., Judges of Kansas City Court of Appeals.

Division One, December 31, 1926.

1. **CERTIORARI: Opinion of Court of Appeals: Conflict.**    In order that the record of a court of appeals may be quashed on **certiorari** its opinion must have announced some general principle of law contrary to the latest announcement of this court upon the subject, or must have announced and applied some conclusion of law contrary to a conclusion of this court on the same or a similar state of facts.

2. **REFEREE: Report in Action at Law: Appellate Practice.**    The findings of fact by a referee in an action at law, if supported by substantial evidence and approved by the trial court, are entitled to the same status and effect in the appellate court as a special verdict of a jury.

3. **MONEY HAD AND RECEIVED BY BANK: Sale of Stock: Recovery by Vendor.**    Where money is received by a bank to which the vendor of stock is legally entitled, the vendor may recover it in an action for money had and received.    If hogs belonged to the vendor at the time they were received by a commission merchant in a city, and the merchant sent his draft to the bank in payment for them, and the bank at the time it received the draft knew that the hogs were the property of the vendor at the time of the sale to the merchant, or that the sale of the hogs by the vendor to a dealer who bought and shipped them to the merchant was a cash sale and that the hogs had not been paid for by such dealer, then the proceeds of the hogs was the property of the vendor, for which he may maintain his action against the bank for the money had and received for his use and benefit.    And the Court of Appeals in ruling to the contrary contravened the decision of this court in Johnson-Brinkman Commission Co. v. Bank, 116 Mo. 558.

4. ———: ———: ———: **Privity of Contract.**    To maintain an action for money had and received privity of contract is not required.    In an action brought by the vendor of hogs against a bank to recover the amount of a check given him by a dealer to whom the hogs were sold, and which the

bank on which the check was drawn refused to pay for lack of funds, it is not essential to the vendor's right to recover that he show a contract, express or implied, between the dealer and the bank whereby the bank agreed or promised to pay checks given by the dealer in payment for live stock purchased by him in the course of his business. The sale being for cash, if the bank knew that the purchase money had not been paid, and that the draft received by it from the commission merchant represented the proceeds of the sale and that such proceeds belonged to the vendor, the law implies the vendor's right to the money, and it is not necessary to show privity of contract. And the Court of Appeals, in holding that, in the absence of an agreement whereby the bank agreed to pay such checks as the dealer might draw in payment for live stock, the vendor could not recover in his action for money had and received by the bank, contravened the decisions of this court in Tamm v. Kellogg, 49 Mo. 118; Clifford Banking Co. v. Commission Co., 195 Mo. l. c. 289, and other cases.

5. ——: ——: ——: **Knowledge of Mode of Dealing.** The effect of the decision in Johnson-Brinkman Commission Co. v. Bank, 116 Mo. 558, is that, where a bank knew all about the manner and mode of purchase of live stock by a dealer, and that the hogs he bought from the vendor had been bought for cash and had not been paid for, at the time the bank refused to pay the check drawn on it by the dealer and given to the vendor in payment, and knew and had known for months that the dealer was insolvent, and for months had paid his checks given for the purchase of live stock when he had no money in the bank and reimbursed itself when drafts from commission merchants came in, the bank was liable to such vendor for money had and received when it refused to pay the check, on account of insufficient funds, after it had received and appropriated the draft of the commission merchant to whom the hogs were sold by the dealer for an amount in excess of the check.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2865, p. 894, n. 56. **Banks and Banking,** 7 C. J., Section 426, p. 698, n. 45. **Courts,** 15 C. J., Section 511, p. 1079, n. 42. **Money Received,** 41 C. J., Section 18, p. 39, n. 55.

*Certiorari.*

RECORD QUASHED.

*Kitt & Marshall* for relator.

(1) The finding made a conclusive case for relator, for money had and received by the bank for his use and benefit, being the cause of action set out in the second count of relator's petition. The judgment of the Court of Appeals should have been for relator. This case is controlled on the facts and law by the case of Johnson-Brinkman Co. v. Bank, 116 Mo. 567. The opinion of the Court of Appeals conflicts therewith. (2) The opinion of the Court of Appeals, holding the bank not liable to relator for money had and received being the basis of the second count of relator's petition, because there was no agreement shown, as alleged in the third count of relator's petition, whereby the bank agreed to pay the checks of Evans, issued on the bank, for stock purchased by Evans, conflicts with and is contrary

to the following controlling decisions of this court, which hold that it is not necessary to show a contract or that privity of contract exist in order to maintain a suit for money had and received. Johnson-Brinkman Co. v. Bank, 116 Mo. 567; Clifford Banking Co. v. Donovan Comm. Co., 195 Mo. 289; Tamm v. Kellogg, 49 Mo. 120. (3) The sale, by relator, of his hogs was a cash sale; the taking of Evans' check was conditional and was not payment unless the check was paid. The title to the hogs did not pass from relator to Evans until paid for, even though the property was delivered. Johnson-Brinkman Co. v. Bank, 116 Mo. 570.

*D. E. Adams* and *Reed, Davis & Ashby* for respondents.

With the case as it stands before this court, respondent, as did the Court of Appeals, recognizes the law as set forth in the case Johnson-Brinkman v. Central Bank, 116 Mo. 558, and insists that the Court of Appeals was right in the statement in the opinion that the facts presented are essentially different in these cases from those with which we are dealing in the present case.

SEDDON, C.—*Certiorari*, whereby relator seeks to have quashed, because of alleged conflict with the rulings of this court, the opinion and judgment of the Kansas City Court of Appeals in the certain cause, entitled, "J. N. Roberts, appellant, vs. Nettleton Bank, respondent," appealed to the latter court from the Circuit Court of Caldwell County. The opinion of the Court of Appeals, to which (as we have uniformly ruled) we must look for the evidentiary facts in every *certiorari* proceeding grounded on alleged conflict of opinion, is as follows:

"This is an action to recover on a check given plaintiff by one J. M. Evans on defendant bank, in the sum of $1083.25, the purchase price of 55 head of hogs bought from plaintiff by said Evans.

"The facts are that defendant is a banking corporation engaged in business at the town of Nettleton, Caldwell County, Missouri, and plaintiff is a farmer and stock man living about ten or eleven miles from Nettleton. J. M. Evans, drawer of the check, for many years prior to December, 1921, was engaged in buying and selling live stock and grain which he shipped to various markets. For ten or twelve years prior to the circumstances giving rise to this controversy, Evans was a customer of defendant bank, maintained an account therein, which he checked against in payment for stock and grain purchased, as well as in payment for his personal indebtedness generally. His account with the bank was active and, at times, his transactions ran as high as $168,000 in one year.

"On or about August 10, 1922, Evans bought a carload of hogs, consisting of 73 head, from parties in the vicinity of Mooresville in Caldwell County, of which 55 head were purchased from J. N. Roberts, plaintiff herein, and in payment therefor Evans gave his individual check on the defendant bank for $1083.25. Plaintiff deposited said check in his bank at Chillicothe, Livingston County, Missouri, and it passed through regular channels to the National Reserve Bank at St. Louis, and by that bank was forwarded to the defendant bank, where payment was refused for insufficient funds, and protested.

"At the time of the presentation and protest there was a balance of $443.19 to the credit of Evans in defendant bank. It had been the custom of Evans on the shipment of stock to draw a draft, bill of lading attached, on the commission firm to whom the shipment was consigned and to have the draft deposited to his credit in defendant bank. In the present instance, Evans drew a draft for $1,000 on the commission firm in St. Joseph, Missouri, to whom the carload of hogs was consigned, which draft was passed to Evans's credit in defendant bank on August 11, 1922. Against his balance in the bank, Evans drew his check in favor of plaintiff in the sum specified. The check was not presented for payment until a few days later when, by the payment by the bank of other checks drawn against said account by Evans, the amount to Evans's credit was $443.19, as stated. Afterwards, on August 19, 1922, Evans deposited $340 to his account in cash, this sum being the balance for the sale of said carload of hogs. Demand was made upon defendant for the payment of the Roberts check which was refused. The testimony shows that the car of hogs in which those bought from plaintiff were shipped sold for more money than Evans had checked on defendant bank and for more than the entire shipment had cost. This suit followed.

"The first amended petition is in three counts, the first of which alleges that defendant received the proceeds of the sale of the hogs in question, with knowledge that the proceeds belonged to plaintiff, and that defendant wrongfully, unlawfully and fraudulently converted said money to its own use. The second count alleges that the bank was indebted to plaintiff in the sum of $1083.25 for money had and received by the bank with knowledge that it was for the use of plaintiff, and that the bank refused to pay same to plaintiff on demand. The third count alleges a verbal contract between Evans and defendant bank whereby defendant agreed to pay checks drawn by Evans on defendant in payment for live stock, grain, etc., purchased by him in the course of his business; and that plaintiff, by virtue of the check given by Evans in payment for the said 55 head of hogs purchased of him by Evans, was a beneficiary of said contract and

thereby was entitled to recover from defendant the amount of the check in question.

"The answer is, first, a general denial, and further a specific denial of the contract with Evans alleged in the petition, and, second, an averment that even if such contract were made, it was *ultra vires* and void and affords no basis for recovery.

"Plaintiff's reply alleges that defendant, by and through its officers, permitted Evans to. give checks on defendant bank for live stock and grain bought by him and knew that the checks so given would have to be paid by it in order for the sellers of live stock and grain so bought by Evans to get their money; that the proceeds of plaintiff's hogs, having been deposited in defendant bank, with knowledge of said facts, defendant is estopped from denying liability upon the check in question.

"By agreement, the cause was referred to Thomas H. Hicklin, as referee, to take the evidence, make findings of the law and facts, and report the same to the court, together with the evidence.   On November 11, 1924, the said referee filed his original report in which judgment for defendant was recommended, based upon findings of fact and conclusions of law, as follows:

" 'I find that the witness Evans bought plaintiff's hogs and gave plaintiff a check on defendant bank for $1083.25, which check was dishonored and protested and payment refused by defendant on the 16th day of August, 1922, the reason given for such refusal, by said defendant, being insufficient funds to the credit of Evans.

" 'As to the contract pleaded in the third count of the petition, I find the evidence adduced insufficient to support a finding that there was such a contract.  I find this, taking Mr. Evans's testimony alone, even if I disregarded that of the bank officers.

" 'I find that Mr. Evans gave many checks beginning long before December, 1921, and continuing up to August, 1922, which were cashed by defendant at times when Evans had no money on deposit in the bank, or that were greatly in excess of his deposit, and that Evans generally gave his checks without stating on the check for what it was given.  That the bank had failed to pay no checks of Evans prior to the check in suit.

" 'I find that the officers of defendant had no actual knowledge that Evans had bought hogs and given check to plaintiff.

" 'I find that the witness Evans was one of the heavy customers of defendant and had been for many years; that he only had one account out of which he checked for both his business and living expenses, and that he was insolvent in December, 1921, and thereafter, and this was well known to the bank, and that the officers of defendant knew that the deposits made by Evans came from the sale of live stock or grain.

" 'I find that on the 16th day of August, 1922, at the time the check was protested, Evans did not have sufficient funds on deposit with defendant to pay same.

" 'As conclusions of law from the above facts I find that defendant was within its legal rights in refusing to pay the check given by Evans to plaintiff.'

"Exceptions to the report of the referee were filed by plaintiff and embraced the objection that there was error in the findings of fact that evidence of the contract pleaded in the third count of the petition was not sufficient to support a finding that there was such a contract. In support of this objection, the exceptions pointed out testimony in plaintiff's behalf tending to support his petition in this respect. The exceptions also included the objection that the officers of defendant bank had no actual knowledge that .Evans had bought hogs from plaintiff and given the check in question in payment therefor.

"It was further objected that the report was against the evidence and the weight of the evidence; that the defendant was within its legal rights in refusing to pay the check in question; that judgment should have been rendered in favor of plaintiff; that the recommendation of the referee is contrary to the law under the evidence; that defendant is estopped from escaping liability on the plea of *ultra vires* as pleaded in the answer, because as to the $340 deposit by Evans, being a part of the proceeds of the sale of plaintiff's hogs, the finding should have been for plaintiff.

"Thereafter, on December 1, 1924, the referee filed the following supplemental report:

" 'I further find that Evans was a customer of defendant bank for years prior to December, 1921, and he had during that time been engaged in the business of buying and selling live stock and grain; that in December, 1921, said Evans owed defendant about $2700. Evans was a married man and had no property except an equity in about sixty acres of land in Livingston County, Missouri, which was encumbered by a deed of trust for $4500 or $5,000. Evans at the time gave to defendant a note for $2700, the amount of his indebtedness, and secured same by a second deed of trust on said sixty acres of land. The two mortgages equalled or exceeded the value of the sixty acres of land, and Evans at that time was insolvent and was known to be such by the defendant bank.

" 'At this time, in December, 1921, when Evans gave the deed of trust to defendant bank, an understanding was had between Evans and the bank that Evans was to go ahead buying and selling live stock and grain as he had in the past and this understanding was had and arrangement was made with the hope and view that Evans might

make sufficient money out of his stock and grain dealings to pay his debt to defendant.

. " 'The defendant's officers knew at this time and at all times that Evans had no money with which to pay for the purchase of stock and grain, and that the only way his checks given for the purchase price of said stock and grain could be paid was from the receipts from the sale of same. From that time Evans continued to buy stock and grain, giving checks in payment of same on defendant bank, and defendant bank always paid his checks so issued. Evans had the proceeds from the sale of all said stock and grain deposited to his account in the defendant bank.

" 'Defendant bank knew that Evans had no other way or means with which to pay for stock and grain except by checks on defendant bank and from the proceeds from the sale of stock and grain which he purchased. The defendant permitted Evans to check on defendant bank to pay for said stock and grain and always paid his checks. This was the general course of business conducted by Evans and defendant at defendant bank from December, 1921, until about August 16, 1922, when the occurrence in question, and which gave rise to this suit, arose.

" 'On August 10, 1922, Evans purchased from plaintiff and others about 73 head of hogs, from plaintiff 55 head and from two or three others 18 head. He gave plaintiff a check for $1083.25 in payment for said hogs, said check being issued on defendant bank. On or about August 11, 1922, and before August 16, 1922, Evans drew a sight draft on Blakely & Blanchard Live Stock Commission Company of St. Joseph, Missouri, for $1,000, to whom Evans shipped these 73 head of hogs, including plaintiff's 55 head, and as a part payment of said hogs, and Evans deposited said draft in defendant bank at that time and received credit for same. At that time defendant bank knew that this draft was in payment for hogs which Evans had purchased and which he, Evans, was shipping to said commission company at St. Joseph.

" 'The draft so issued and given to defendant was paid by the commission company. The defendant paid checks issued by Evans as they were presented, and on August 16, 1922, the check of plaintiff so given by Evans to him in payment for said hogs so purchased of plaintiff, was presented for payment to defendant, coming to defendant from the clearing house or Federal Reserve Bank at St. Louis. At that time Evans had on deposit to his credit in defendant bank a balance of $443.19; this balance was left from previous deposits, including the $1,000 draft deposited by Evans in defendant bank from sale of the hogs of plaintiff. The defendant refused to pay plaintiff's check and protested same. On that date, August 16, 1922, and before this check of plaintiff's was protested, Evans told the cashier of

defendant that the $1,000 draft which he had previously, on August 11, deposited in defendant bank and drawn on Blakely & Blanchard Live Stock Commission Company, St. Joseph, Missouri, was money arising from the sale by him of the hogs which he, Evans, had purchased from plaintiff, and for which purchase price he had given to plaintiff this check on defendant for $1083.25, and that he, Evans, had in his pocket $340 more, which was the balance of the sale price of said stock which he had purchased of plaintiff and others at Mooresville, and that he would deposit the $340 in the defendant bank if it would pay plaintiff's check. This defendant refused to do and protested plaintiff's check.

" 'Evans sold said hogs for more than he had paid for them; the amount he received from the sale of the hogs, to-wit, $1340, exceeded what he paid for them and for which he had issued checks on defendant therefor.

" 'Afterwards and on or about August 21, 1922, Evans deposited the $340 in cash, being the balance of the sale price of plaintiff's hogs in defendant bank.

" 'I further find that there was no contract as pleaded in the third count of the petition.

" 'As a conclusion of law from above facts I find that defendant was within its legal rights in refusing to pay the check given by Evans to plaintiff.

" 'I therefore recommend that judgment be rendered in favor of defendant.'

"Plaintiff filed exceptions to the supplemental report, containing the objections made against the first report of the referee, and in addition thereto declared that the recommendations of the referee in his supplemental report were contrary to his findings of fact and not supported thereby; that the finding in the supplemental report is not a full and complete finding of all essential facts shown by the evidence, in that the referee failed to find as a fact that all the proceeds from the sale by Evans of stock and grain, and for payment of which Evans had given checks on the defendant bank, came into its hands and were deposited to the credit of Evans therein.

"The court overruled plaintiff's exceptions and entered judgment for defendant in accordance with the report of the referee. Motions for new trial and in arrest were overruled and plaintiff appeals.

"We are confronted with 28 assignments of error, the first being that the court erred in overruling the exceptions to the referee's reports and in entering judgment for defendant, and this charge embraces the points urged in the other 27, including the overruling of motions for a new trial and in arrest. We, therefore, shall consider them together.

"Plaintiff's contention is based upon the following elements which he insists are shown by the record: (1) That there was a verbal contract, or agreement and arrangement, between Evans and defendant bank whereby Evans was allowed to draw checks against defendant in payment for stock and grain purchased, and that in depositing with defendant drafts with bills of lading attached, such funds became special deposits in favor of the parties from whom Evans purchased the stock; (2) That defendant's officers knew that Evans had purchased the stock from plaintiff and that the draft with bill of lading attached covered this purchase. Of course, if the evidence clearly shows that there was a contract and agreement between defendant and Evans, that the checks in payment for cattle and grain purchased by him would be honored, regardless of the status of his account with defendant, there is an end to this appeal in plaintiff's favor. Without setting up the evidence on this point, we need only say that it is flatly contradictory, plaintiff insisting that there was such a contract, and defendant declaring that no such contract or agreement was made. Each party produced evidence in support of his position. In this situation, had the case been tried to a jury, unquestionably the finding of facts by the jury would not be disturbed by this court.

"It is the accepted rule that the referee's finding of facts has the same effect as a special verdict. In Home Coal Co. v. City of Macon, 262 S. W. 59, this court held 'the findings of fact made by the referee having been approved and confirmed by the trial court occupy the same status upon appeal as the verdict of a jury, and such findings will not be disturbed if supported by substantial evidence' citing Kline Suit Co. v. Morris, 293 Mo. 494, 240 S. W. 96. To the same effect is the holding of the Supreme Court in State ex rel. v. Wilson, 288 Mo. 315, 232 S. W. 140, and City v. Parker-Washington Co., 196 S. W. 767. In the case at bar there was substantial evidence in defendant's behalf that the contract alleged in the third count of the amended petition, in fact, was never made; and this is contradictory of the testimony of Evans to the effect that there was such a contract and agreement. The referee found against plaintiff on this point, and as his finding, approved by the court, has the same status upon appeal as the verdict of a jury, we will not disturb such finding and the judgment rendered thereon.

"Plaintiff relies chiefly upon the holdings in the cases of Johnson-Brinkman Co. v. Bank, 116 Mo. 558, and York v. Bank, 105 Mo. App. 127, but in our view, the facts presented are essentially different in these cases from those with which we are dealing in the present case. Evans testified that defendant had actual knowledge of the purchase of the hogs in question, and the supplemental report of the referee so holds, but he found there was in fact no contract whereby defend-

ant agreed to pay such checks as might be drawn in payment of such purchases. The rule applied in the cited cases therefore has no application here. Moreover, there is testimony tending to show that Evans maintained in defendant bank an ordinary checking account for all purposes, and that at the time the check was presented for payment there were not sufficient funds in the bank to cover it. Without any agreement to the contrary, defendant was justified in refusing payment.

"In our view of the case, plaintiff's right to recover must rest upon the promise of defendant, express or implied, to take care of such checks, together with knowledge of its officers that the check in question was given in payment of the hogs purchased. But, as already stated, these were controverted issues, there was testimony offered in support of both sides, and the finding of the referee was against plaintiff.

"Defendant urges that in order for plaintiff to recover there must be a showing that the proceeds of the draft for $1,000 and the $340 in cash, later deposited by Evans, must include elements of a special deposit, and that in order to show that the deposit, in fact, was special, it must be conclusively shown that it was received by the bank under an agreement, express or implied, that it should be kept separate from other funds of the bank, and the identical money returned to the depositor. [Schulz v. Bank, 246 S. W. 614.] It was also held in the Schulz case that the deposit is also special when it is deposited to be applied to a specific purpose, notice of which is given to the bank at the time the deposit is made, or, at least, before it is disposed of, either by being applied to the payment of other checks given by the depositor on his general account, or applied by the bank to the depositor's indebtedness. This rule would seem to apply to the case at bar. It has been held that knowledge, or notice, that a deposit is to be treated as special is necessary in order to charge the bank. [Thomas v. Farmer's Bank, 217 S. W. (Mo. App.) 860.] As to whether or not the proceeds of the sale of the carload of hogs in question were to be treated as a special deposit to be paid by [to] plaintiff and others from whom Evans made purchases, is a controverted issue, decided against plaintiff by the referee, on substantial evidence. It will not be contended, we think, that defendant was under any obligation to pay an overdraft in the absence of an agreement to do so, express or implied, and the fact that a depositor had been permitted to overdraw does not establish such a precedent as to render the bank liable if it refuse to continue to pay overdrafts by such depositor. [Bank v. Bank, 154 S. W. (Tenn.) 965; Schoonmaker v. Gilmore, 84 Ill. App. 17.]

"For reasons above stated, the judgment is affirmed."

Relator contends (in the language of his brief) that "the Court of Appeals holds that, since the referee found against relator as to the existence of the agreement alleged in, and which is the basis of, the *third count of relator's petition,* viz., that the bank had agreed to pay the checks of Evans, issued by Evans on the bank, for payment of stock purchased by Evans, relator could not recover on the third count of his petition, but the Court of Appeals goes farther and holds that relator cannot recover on the *second count of his petition,* based on money had and received by the bank to relator's use, because the contract or promise, alleged by relator in the *third count of his petition,* was not sustained. The Court of Appeals, in effect, thereby rules that, in order for relator to recover from the bank for money had and received, he must show, and the court must find, that a contract existed between the bank and Evans whereby the bank agreed to pay checks drawn on the bank by Evans for stock purchased by Evans in his business; that, to sustain the *second count of his petition,* for money had and received, it was essential that relator show, and that the referee and the trial court find, that the contract, alleged to have existed between the bank and Evans, was in fact made. This holding, by the Court of Appeals, is in direct conflict with the controlling decisions of this (the Supreme) Court in the following cases: Johnson-Brinkman Commission Co. v. Bank, 116 Mo. 558; Clifford Banking Co. v. Commission Co., 195 Mo. 262; and Tamm v. Kellogg, 49 Mo. 118. These decisions hold that it is not essential, to support an action for money had and received, that any contract be shown, but, on the other hand, privity of contract is not essential; all that it is essential to show is that the defendant has or had money in his hands which does not belong to him, but belongs to another; the law furnishes the necessary privity of contract to sustain the action."

Reference is made to the case of Johnson-Brinkman Commission Company v. Bank in the opinion of the Court of Appeals herein, thus: "Plaintiff relies chiefly upon the holdings in the cases of Johnson-Brinkman Company v. Bank, 116 Mo. 558, and York v. Bank, 105 Mo. App. 127, but, in our view, the facts are essentially different in these cases from those with which we are dealing in the present case."

In State ex rel. v. Trimble, 300 Mo. l. c. 101, we said, in Banc: "Our jurisdiction in this class of *certiorari* cases is dependent upon conflict or alleged conflict in opinions. . . . The purpose of this peculiar form of *certiorari* is to secure uniformity in opinions, and harmony in the law." Under the clearly defined limitation upon our powers of supervision over inferior courts of the State, including the several Courts of Appeals, in order that the record of a Court of Appeals in a given case may be quashed by this court on *certiorari*, the opinion in such case must have announced some general principle

of law contrary to the latest announcement of this court upon the subject, or on a given state of facts must have announced and applied some conclusion of law contrary to a conclusion of this court on a like, or similar, state of facts. [State ex rel. v. Reynolds, 214 S. W. (Mo.) l. c. 122; State ex rel. v. Reynolds, 287 Mo. l. c. 174.] Are, therefore, the facts upon which was predicated the principle, or conclusion, of law announced by this court in Johnson-Brinkman Commission Company v. Bank, supra, essentially like, or similar to, those involved in the present case, and is the principle of law announced by this court in the cited case applicable to the present controversy? If so, then the record of the Court of Appeals must be quashed; if not, our writ herein should be quashed.

Adverting to the opinion of this court in Johnson-Brinkman Commission Company v. Bank, 116 Mo. 558, for the evidentiary facts upon which the principle, or conclusion, of law therein announced was predicated, we find the facts thus stated in that opinion: "Prior to August 30, 1890, the Imboden Commission Company, a corporation engaged in the grain business, contracted to buy of the plaintiff in this action, also a corporation engaged in the grain business, six carloads of wheat. On that day, Saturday, August 30, 1890, the plaintiff delivered to the Imboden Commission Company the six cars of wheat in controversy, by delivering to them the original bill of lading, the inspector's certificate, elevator receipts, etc., and receiving in return the check of the Imboden Commission Company on defendant bank for $3,719.37, being the price agreed upon. The Imboden Commission Company went to the Missouri Pacific Railway Company, and surrendered the Johnson-Brinkman bill of lading, receiving in exchange therefor a bill in their own name, consigning the grain to their order in St. Louis, and marked: 'Notify C. H. Albers & Co.,' to whom they had sold it. They drew a draft on Albers & Co. for $3,743.19, which amount represented the price of the grain agreed on with Johnson-Brinkman Commission Company, and certain commissions and charges for exchange. This draft was attached to the Imboden bill of lading, and, together with the usual receipts and certificates, was deposited with the defendant bank, being at once carried to the credit of the Imboden Commission Company. The purpose of the deposit was for the bank to forward the draft, etc., to St. Louis and collect the proceeds of Albers & Co. On the same day, August 30th, the bank sent the draft and bill of lading to its correspondent in St. Louis, to whom, on Monday, September 1st, during banking hours, the amount thereof was paid by Albers & Co. The plaintiff deposited the check which Imboden Commission Company had given it for the wheat to their account at the Midland National Bank on the afternoon of Saturday, and on Monday, September 1st, it passed through the clearing house and was presented to defendant bank for payment,

and payment was refused. On the afternoon of Monday, September 1st, apparently after banking hours, Imboden, president of the Imboden·Commission Company, which had drawn the check, and Mr. A. D. Johnson, president of the plaintiff corporation, called on Mr. Thayer, cashier of the Central Bank, and demanded the wheat back, or the money for the wheat. Thayer, claiming on the part of the bank that he had no funds applicable to such payment, refused the request; saying, however, that if it should turn out Imboden had anything he would turn it over. . . . On Saturday, August 30th, the account of the Imboden Commission Company was overdrawn $8,041.80. Certain checks were paid on that day; and on the first of September, when the Johnson-Brinkman Commission Company presented their check, the overdraft amounted to $8,250.20, after crediting the amount of the Albers draft, and debiting the aggregate amount of checks paid that day, amounting to $3,689.05. When the check to the Johnson-Brinkman Commission Company was presented, therefore, there were no funds to meet it.''

Upon the evidentiary facts thus stated, this court then announced the principle, or conclusion, of law controlling that case, in this language: ''But where money is received by one to which another is legally entitled, the latter may recover it in an action for money had and received. Under the Missouri code, we have but one form of action for the enforcement or protection of private rights, and redress or prevention of private wrongs, which is denominated a civil action. . . . If the wheat belonged to plaintiff at the time it was received by Albers & Company in St. Louis, and the latter afterwards sent this draft to defendant in payment therefor, and if at the time of the receipt thereof defendant knew that the wheat was the property of plaintiff at the time of the sale to Albers & Company, or that the sale of the wheat by plaintiffs to the Imboden Commission Company was a cash sale and that the wheat had not been paid for by Imboden Commission Company, then the proceeds of the wheat was the property of plaintiff, and it may maintain its action against defendant as for money had and received to its use and benefit. [Citing authorities.] *Nor is it essential that any privity of contract should be shown;* if plaintiff's right to the money is established and the defendant is shown to have received it under circumstances that he (it) ought not to retain it, *the law implies a promise to pay it to the party who ought to have it.* [Citing authorities.] . . . The terms of the sale of the six carloads·of wheat by Johnson-Brinkman Commission Company to Imboden Commission Company being cash, and for which the latter gave a worthless check, was the sale incomplete, or did the title of the wheat pass by the delivery of the bill of lading by the vendor to the purchaser and those claiming title under him with notice at the time of his purchase of the terms of the contract, or that

the purchase money had not been paid?  .  .  .  That a check on a bank is not payment unless by express contract it is so received, and is only payment when the money is received on it; and that there is no presumption that a creditor takes a check in absolute payment arising from the mere fact that he accepts it from the debtor, is well-settled law, there is no question. [Citing authorities.] As between vendor and purchaser, where the sale of the chattels is a cash sale, the delivery of the thing sold and the payment of the purchase money are concurrent acts, and the former may reclaim his property if the purchase money be not paid according to the terms of the sale, either in the hands of the vendee or of a purchaser with or without notice, of the terms of the sale, and that the purchase money has not been paid, provided the vendor has not waived the cash payment and has been guilty of no laches or such conduct as would estop him from so doing. [Citing authorities.]  .  .  .  The sale of the wheat being a cash sale, if the defendant knew that the purchase money therefor had not been paid by Imboden Commission Company, or that Imboden Commission Company was not the owner of the wheat at the time it, defendant, received the draft in payment therefor from Albers & Co., through their correspondent in St. Louis, and applied it to the credit of Imboden Commission Company, it is not an innocent purchaser and must account to plaintiff for the amount of the purchase money according to the contract price, between plaintiff and the Imboden Commission Company.  .  .  .  The evidence shows very conclusively that defendant knew all about the business transactions of Imboden Commission Company, as all payments for grain purchased by it, as well also as all collections received on sales of grain sold by it, were made through defendant bank. The conclusion is irresistible that it knew all about the manner and mode of the purchase of grain by the Imboden Commission Company and that the wheat in controversy when bought by it, was bought for cash, and that it had not been paid for.'' Whereupon, the judgment *nisi* for money had and received in favor of the Johnson-Brinkman Commission Company and against the defendant bank was affirmed by this court.

Looking now to the opinion of the Kansas City Court of Appeals in the instant proceeding for the evidentiary facts, we find therein certain facts set out in the two separate reports, or findings, of the referee, to which findings, approved by the trial court and supported by substantial evidence, the Court of Appeals in this law action has rightly ascribed the status and effect of a special verdict of a jury. [Home Coal Co. v. City of Macon, 262 S. W. 59; Kline Cloak & Suit Co. v. Morris, 293 Mo. 478; State ex rel. v. Wilson, 288 Mo. 315; St. Louis to use v. Parker-Washington Co., 271 Mo. 229; Johnston v. Pump Co., 274 Mo. 414; and Roloson v. Riggs, 274 Mo. 522.] Those facts are substantially as follows: Evans bought relator's hogs

on August 10, 1922, and gave relator a check on defendant bank for $1083.25, which check was dishonored and protested, and payment refused by defendant bank, on the 16th day of August, 1922, the reason given by defendant bank being insufficient funds to the credit of Evans. Evans gave many checks, beginning long before December, 1921, and continuing up to August, 1922, which were cashed by defendant bank at times when Evans had no money on deposit in the bank, or which were greatly in excess of his deposit, and Evans generally gave his checks without stating on the check for what it was given. The defendant bank had failed to pay no checks of Evans prior to the check in suit. The officers of defendant bank had no actual knowledge that Evans had bought hogs and given check to relator. Evans was one of the large customers of defendant bank and had been for many years; he had only one account, out of which he checked for both his business and living expenses. Evans was insolvent in December, 1921, and thereafter, and this fact was well known to defendant bank, and the officers of defendant bank knew that the deposits made by Evans came from the sale of live stock or grain. On August 16, 1922, when the check to relator in controversy was protested, Evans did not have sufficient funds on deposit with defendant bank to pay same. Evans was a customer of defendant bank for years prior to December, 1921, and he had during that time been engaged in the business of buying and selling live stock and grain. In December, 1921, Evans owed defendant bank about $2,700. He then gave defendant bank a note for that amount, secured by second deed of trust on sixty acres of land he owned. The first and second deeds of trust equaled, or exceeded, the value of the sixty acres of land, and Evans at that time was insolvent and was known to be insolvent by defendant bank. In December, 1921, when Evans gave the deed of trust to defendant bank, *an understanding was had between Evans and the bank that Evans was to go ahead buying and selling live stock and grain as he had in the past and this understanding was had, and arrangement was made, with the hope and view that Evans might make sufficient money out of his stock and grain dealings to pay his debt to defendant bank.* Defendant's officers knew at this time, and at all times, that Evans had no money with which to pay for the purchase of stock and grain, and that the only way his checks given for the purchase price of said stock and grain could be paid was from the receipts from the sale of same. From that time (December, 1921) Evans continued to buy stock and grain, giving checks in payment of same on defendant bank, and defendant bank always paid his checks so issued. Evans had the proceeds from the sale of all said stock and grain deposited to his account in the defendant bank. Defendant bank knew that Evans had no other way or means with which to pay for stock and grain except by checks on de-

fendant bank and from the proceeds from the sale of stock and grain which he purchased. Defendant permitted Evans to check on defendant bank to pay for said stock and grain and always paid his checks. *This was the general course of business conducted by Evans and defendant, at defendant bank, from December, 1921, until about August 16, 1922,* when the occurrence in question, giving rise to relator's suit, arose. Evans purchased the hogs from relator, and gave relator his check therefor, on August 10, 1922. On or about August 11, 1922, and before August 16, 1922, Evans drew a sight draft on a commission company of St. Joseph, Missouri, for $1,000, to which commission company Evans shipped the hogs purchased from relator, with several other head purchased from other parties. The draft was in part payment of said hogs. Evans deposited said draft in defendant bank at that time and received credit for same, at which time, defendant bank knew that the draft was in payment for hogs which Evans had purchased and which Evans was shipping to said commission company at St. Joseph. The draft so issued and given to defendant bank was paid by the commission company. Defendant bank paid checks issued by Evans as they were presented and, on August 16, 1922, the check given by Evans to relator in payment for the hogs purchased of relator was presented to defendant bank for payment, coming to defendant from the clearing house or Federal Reserve Bank at St. Louis. Evans then had on deposit to his credit in defendant bank a balance of $443.19, which balance remained from previous deposits, including the $1,000 draft deposited by Evans in defendant bank from sale of relator's hogs. Defendant refused to pay the check given to relator and protested same. On that date, August 16, 1922, and before the check was protested, Evans told the cashier of defendant bank that the draft which had been deposited in defendant bank represented money arising from the sale by him of the hogs he had purchased from relator, and other parties. Evans sold the hogs for more than he had agreed to pay for them. On or about August 21, 1922, Evans deposited in defendant bank $340 in cash, being the balance of the sale price of the hogs to the commission company.

The opinion of the Court of Appeals sets out the following evidentiary facts, in addition to those recited in the findings of the referee: For ten or twelve years prior to the circumstances giving rise to the present controversy, Evans was a customer of defendant bank, maintaining an account therein which he checked against in payment for stock and grain purchased, as well as in payment for his personal indebtedness generally. His account with the bank was active and, at times, his transactions ran as high as $168,000 in one year. Relator deposited the check from Evans in his bank at Chillicothe, and the check passed through regular channels to the Federal Reserve Bank at St. Louis, and by that bank was forwarded to defendant bank.

316 Mo.—24.

where payment was refused for insufficient funds and protested. It had been the custom of Evans, on the shipment of stock, to draw a draft, bill of lading attached, on the commission firm to whom the shipment was consigned and to have the draft deposited to his credit in defendant bank. The car of hogs, including those purchased from relator, sold for more money than Evans had checked on defendant bank and for more than the entire shipment had cost.

Unlike our esteemed brethren of the Court of Appeals, we fail to see any essential difference or distinction between the evidentiary facts in the instant proceeding and those facts set out in our opinion in the case of Johnson-Brinkman Commission Company v. Bank, 116 Mo. 558, in which latter case we ruled that the evidence therein was sufficient to support an action and judgment for money had and received, and that it was not essential that any privity of contract be shown. While respondents herein may be right in holding that relator cannot recover upon the third count of his petition, because the finding of the referee was against relator upon the allegation of said third count of his petition that there was a contract or agreement between defendant bank and Evans that Evans's checks given for stock and grain purchased by him would be honored, regardless of the status of his account with defendant bank, yet it was not incumbent upon relator to establish such an agreement or contract in order to recover upon the second count of his petition, which was a count for money had and received by defendant bank to relator's use. In Tamm v. Kellogg, 49 Mo. l. c. 120, we said: "In order to sustain an action for money had and received, privity of contract is not required. As a rule, when one person has in his hands money belonging to another, the law implies privity, and an action will lie on behalf of the latter." So, in Clifford Banking Company v. Commission Company, 195 Mo. l. c. 289, we said: "It is not necessary to allege a promise to pay, nor is privity of contract required. The law implies the privity. [Tamm v. Kellogg, 49 Mo. 118.] In this behalf, the language of PARKER, C. J., in Hall v. Marston, 17 Mass. 574, quoted approvingly by GOODE, J., in Richardson v. Drug Co., 92 Mo. App. l. c. 533, is to the point, thus: 'There are many cases in which that action (*assumpsit* for money had and received) is supported without any privity between the parties other than what is created by law. Whenever one man has in his hands the money of another, which he ought to pay over, he is liable to this action, *although he has never seen or heard of the party who has the right*. When the fact is proved that he has the money, if he cannot show that he has legal or equitable ground for retaining it, the law creates the privity and the promise.' "

A close study and analysis of our opinion in Johnson-Brinkman Commission Company v. Bank, supra, discloses that it is nowhere stated therein that there was any contract or agreement between the

defendant bank and the Imboden Commission Company that the bank would honor the checks of the Imboden Commission Company, regardless of the status of its account with the bank, but it is stated therein that "the evidence shows very conclusively that defendant (bank) knew all about the business transactions of Imboden Commission Company, as all payments for grain purchased by it, as well also as all collections received on sales of grain sold by it, were made through defendant bank," and, furthermore, that "the conclusion is irresistible that it (the bank) knew all about the manner and mode of the purchase of grain by the Imboden Commission Company, and that the wheat in controversy when bought by it, was bought for cash, and that it had not been paid for."

So, in the instant proceeding, we think that the evidentiary facts, as disclosed on the face of the opinion of the Court of Appeals, including the findings of the referee, likewise make the conclusion irresistible that the defendant bank knew all about the manner and mode of the purchase of live stock and grain by Evans, and that the hogs purchased by Evans from relator were bought for cash and that they had not been paid for. No other conclusion can well be arrived at in view of the findings of the referee as to the manner and mode of Evans's business operations and his relations with the defendant bank between December, 1921 (and even before that time), and August 16, 1922, when the check in controversy was presented for payment in due course and through regular channels. Our rulings and legal conclusions in Johnson-Brinkman Commission Company v. Bank, 116 Mo. 558, have never been overruled or criticized by this court, so far as we find, and that decision has apparently been followed, and expressly approved, in recent decisions of this court as late as Lewis v. McMahon & Co., 307 Mo. l. c. 566. In view of our holding in Johnson-Brinkman Commission Company v. Bank, supra, we are of the opinion that relator was entitled to a judgment (for money had and received by the defendant bank to his use) upon the second count of his petition, under the findings of the referee, which findings, according to the opinion of the Court of Appeals, were supported by substantial evidence and approved by the trial court.

It follows that the opinion of the Court of Appeals contravenes our rulings and legal conclusions in the controlling decision rendered in the case of Johnson-Brinkman Commission Company v. Bank, 116 Mo. 558, as well as other controlling decisions of this court, and the record of that court must be quashed. It is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Graves, J.,* absent.